STEPHEN S. FORD (OSB No. 92308)
Email: steve.ford@techlaw.com
MARGER, JOHNSON & McCOLLOM, P.C.
210 S.W. Morrison Street, Suite 400
Portland, OR  97204
Telephone:(503) 222-3613
Facsimile:(503) 274-4622

LYNN H. PASAHOW (CSB No. 54283, *pro hac vice*)
Email: lpasahow@fenwick.com
CHARLENE M. MORROW (CSB No. 136411, *pro hac vice*)
Email: cmorrow@fenwick.com
VIRGINIA K. DEMARCHI (CSB No. 168633, *pro hac vice*)
Email: vdemarchi@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Telephone:(650) 988-8500
Facsimile:(650) 938-5200

Attorneys for Defendant
XAP CORPORATION

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| COLLEGENET, INC., | Civil No. 03-01229-BR |
| Plaintiff, | |
| v. | XAP CORPORATION'S POST-TRIAL BRIEF (BENCH TRIAL PHASE) |
| XAP CORPORATION, | |
| Defendant. | |

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION ................................................ | 1 |
| II. | SUMMARY OF ARGUMENT ......................................... | 1 |
| III. | COLLEGENET'S LANHAM ACT CLAIM IS BARRED BY LACHES ......... | 2 |
| IV. | COLLEGENET IS NOT ENTITLED TO MONETARY DAMAGES FOR ITS LANHAM ACT CLAIM ................. | 9 |
|  | A. Lanham Act Damages Are Intended to Be Compensatory and Require Proof of Actual Deception and Actual Injury ................... | 9 |
| V. | LOST PROFITS WILL COMPENSATE COLLEGENET FOR ANY HARM IT SUFFERED ....................... | 15 |
|  | A. An Award of Lost Profits Is an Equitable Remedy Determined by the Court ............ | 15 |
|  | B. CollegeNET Waived Any Claimed Right to a Jury Trial on Lost Profits ............... | 16 |
|  | C. Compensatory Damages Should Be Limited to No More Than $893,199 .................... | 18 |
|  | D. The Court Should Not Award Damages For Any Claimed Loss Prior to June 10, 2002 or After 2004 .... | 22 |
| VI. | COLLEGENET IS NOT ENTITLED TO DISGORGEMENT OF XAP'S PROFITS ........................ | 23 |
|  | A. Disgorgement of XAP's Profits Is Improper ........... | 23 |
|  | B. Disgorgement, If Any, Should Be Limited to No More Than $2,553,245 ................. | 30 |
| VII. | COLLEGENET IS NOT ENTITLED TO ATTORNEYS' FEES ............. | 32 |
|  | A. An Exceptional Case Requires At Least a Proof of Willfulness ................. | 32 |
|  | B. This Is Not an Exceptional Case ..................... | 32 |

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*American Honda Motor Co. v. Two Wheel Corp.*,
918 F.2d 1060 (2d Cir. 1990).........................30, 31

*Balance Dynamics Corp. v. Schmitt Industries*,
204 F.3d 683 (6th Cir. 2000)...........................11

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*,
750 F.2d 903 (Fed. Cir. 1984).....................9, 10, 24

*Burndy Corp. v. Teledyne Industries, Inc.*,
748 F.2d 767 (2d Cir. 1984)............................25

*Champion Spark Plug Co. v. Sanders*,
331 U.S. 125 (1947)................................24, 25

*Danjaq LLC v. Sony Corp*,
263 F.3d 942 (9th Cir. 2001)............................9

*Earthquake Sound Corp. v. Bumper Industries*,
352 F.3d 1210 (9th Cir. 2003)...................27, 32, 33

*Ericsson, Inc. v. Harris Corp.*,
352 F.3d 1369 (Fed. Cir. 2003)........................22

*E-Systems, Inc. v. Monitek, Inc.*,
720 F.2d 604 (9th Cir. 1983)............................3

*General Bedding v. Echevarria*,
947 F.2d 1395 (9th Cir. 1991)...........................3

XAP's POST-TRIAL BRIEF

**TABLE OF AUTHORITIES (cont.)**

Page(s)

*George Basch Co., Inc. v. Blue Coral Inc.,*
968 F.2d 1532 (2d Cir. 1992) ....................... 25
*Gracie v. Gracie,* 217 F.3d 1060 (9th Cir. 2000) ............... 32
*Grain Processing Corp. v. American Maize Products Co.,*
185 F.3d 1341 (Fed. Cir. 1999) .................... 22
*Harper House, Inc. v. Thomas Nelson, Inc.,*
889 F.2d 197 (9th Cir. 1989) .............. 10, 11, 23
*Highway Cruisers of Cal., Inc. v. Sec. Indus., Inc.,*
374 F.2d 875 (9th Cir. 1967) .................. 26, 27
*Jarrow Formulas Inc. v. Nutrition Now, Inc.,*
304 F.3d 829 (9th Cir. 2002) ................ 2, 15, 22
*Lanphere Enters. v. Jiffy Lube Int'l,* No. CV 01-1168-BR,
2003 U.S. Dist. LEXIS 16205 (D. Or. July 9, 2003) ........... 12
*Lindy Pen Co. v. Bic Pen Corp.,*
982 F.2d 1400 (9th Cir. 1993) .............. 10, 24, 27, 32
*Maier Brewing Co. v. Fleischmann Distilling Corp.,*
390 F.2d 117 (9th Cir. 1968) ........ 24, 25, 26, 30
*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,*
316 U.S. 203 (1942) ................................ 16
*Nintendo of America, Inc. v. Dragon Pacific International,*
40 F.3d 1007 (9th Cir. 1994) .................. 24, 26
*Playboy Enters., Inc. v. Baccarat Clothing Co.,*
692 F.2d 1272 (9th Cir. 1982) ..................... 32
*Pope v. Savings Bank of Puget Sound,*
850 F.2d 1345 (9th Cir. 1988) ..................... 16
*Porous Media Corp. v. Pall Corp.,*
110 F.3d 1329 (8th Cir. 1997) ................. 10, 11
*Santana Prods. v. Bobrick Washroom Equip., Inc.,*
401 F.3d 123 (3d Cir. 2005) ........................ 2
*Seven-Up v. Coca-Cola,* 86 F.3d 1379 (5th Cir. 1996) ....... 27, 32
*Sewell v. Jefferson County Fiscal Court,*
863 F.2d 461 (6th Cir. 1988) ...................... 17
*Soliman v. Philip Morris, Inc.,*
311 F. 966 (9th Cir. 2002) ......................... 3
*Southland Sod Farms v. Stover Seed Co.,*
108 F.3d 1134 (9th Cir. 1997) ..................... 11
*St. Charles Mfg. Co. v. Mercer,*
737 F.2d 891 (11th Cir. 1983) ..................... 15
*Tillamook Country Smoker, Inc. v. Tillamook County Creamery*
*Ass'n,* 465 F.3d 1102 (9th Cir. 2006) ...................... 3
*Transgo, Inc. v. Ajac Transmission Parts Corp.,*
768 F2d 1001 (9th Cir. 1985) ...................... 33
*U-Haul Int'l, Inc. v. Jartran, Inc.,*
793 F.2d 1034 (9th Cir. 1986) ..................... 33
*W. E. Bassett Co. v. Revlon, Inc.,*
435 F.2d 656 (2d Cir. 1970) ....................... 30
*Watec Co. v. Liu,*
403 F.3d 645 (9th Cir. 2005) ...................... 32
*Westinghouse Electric Corp. v. General Circuit Breaker*
*Electric Supply, Inc.,* 106 F.3d 894 (9th Cir. 1997) ........... 3
*White v. McGinnis,* 903 F.2d 699 (9th Cir. 1990) ............... 16
*William H. Morris Co. v. Group W, Inc.,*
66 F.3d 255 (9th Cir. 1995) ....................... 13

## I.   INTRODUCTION

XAP Corporation submits this post-trial brief regarding the following issues that remain for the Court's consideration: (1) whether CollegeNET's Lanham Act claim is barred by laches; (2) if the claim is not barred by laches, whether CollegeNET is entitled to any monetary recovery; (3) if entitled to monetary recovery, whether CollegeNET may recover its claimed lost profits and, if so, in what amount; (4) if entitled to monetary recovery, whether CollegeNET may obtain disgorgement of XAP's profits in addition to lost profits and, if so, in what amount; and (5) whether this is an exceptional case warranting an award of attorneys' fees.

## II.  SUMMARY OF ARGUMENT

Laches bars CollegeNET's Lanham Act claim.  The statements challenged in this case were first made by XAP in early 1999 and continuously thereafter, yet CollegeNET waited until June 2004 to file suit.  CollegeNET's professed ignorance of its claim until March or May 2004 if not disingenuous reflects a total failure to comply with its duty to diligently investigate.  CollegeNET's claim is based largely on statements attributed to Allen Firstenberg, XAP's deceased founder and former CEO.  The prejudice from CollegeNET's delay in filing suit until three months after his death is clear and substantial.

Even if CollegeNET's unreasonable delay does not preclude its Lanham Act claim, CollegeNET is not entitled to recover monetary damages, in any form, from XAP.  The jury was not asked to find, and CollegeNET has not proved, actual deception or actual injury, both prerequisites for monetary recovery.  For the Lanham Act

violation, CollegeNET would at most be entitled to an injunction.

Moreover, CollegeNET's claim for *both* its actual damages *and* disgorgement aggregating over $70 million ($34,866,339 and $35,198,260, respectively) is grossly excessive.  The Lanham Act's remedies are intended to be *compensatory* only; CollegeNET seeks a windfall.  CollegeNET's compensatory damages, if due, would be limited to a maximum of $893,199, representing the only conceivable loss suffered by CollegeNET in relation to the 15% of XAP's applications submitted by users who registered on Mentor sites with opt-in questions, the only users whose personal information was potentially subject to disclosure.

Finally, neither the law nor the record supports CollegeNET's claim that XAP's advertising was "willful" or that an award of attorneys' fees is warranted because the case is somehow "exceptional."

### III. COLLEGENET'S LANHAM ACT CLAIM IS BARRED BY LACHES

Laches applies if (1) CollegeNET's delay in filing suit was not reasonable and (2) XAP was prejudiced by the delay.  *Jarrow Formulas Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002) (claim barred "if [plaintiff] fail[ed] to file suit promptly when the defendant commence[d] the wrongful conduct").

Both prongs of the laches defense are *presumed* satisfied if CollegeNET filed suit outside the applicable limitations period. *See Jarrow Formulas*, 304 F.3d at 836; *Santana Prods. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005) (defendant "'enjoys the benefit of a presumption of inexcusable delay and prejudice'").  The parties agree that in the absence of an

explicit provision in the Lanham Act the applicable limitations period is two years, the Oregon statute of limitations for fraud claims (O.R.S. 12.110(1)).  (CollegeNET's Trial Mem., Dkt. 604 at 8.)

CollegeNET filed its false advertising claim on June 10, 2004. If the limitations period began to run before June 10, 2002, XAP is entitled to a presumption that laches applies.

The limitations period for laches begins to run "'from the time the plaintiff knew or should have known about its potential cause of action.'"  *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102, 1108-09 (9th Cir. 2006). The test for laches is not whether CollegeNET knew every detail of its false advertising claim, but whether it knew or should have known the necessary elements of its claim.  *See Westinghouse Elec. Corp. v. General Circuit Breaker Elec. Supply, Inc.*, 106 F.3d 894, 899 (9th Cir. 1997) (details of case need not be known to trigger laches, only facts supporting the elements of the claim); *Soliman v. Philip Morris, Inc.*, 311 F.3d 966, 971-72 (9th Cir. 2002) (statute begins to run when the plaintiff "'has reason at least *to suspect* a factual basis for its [the cause of action's] elements'").  Moreover, CollegeNET had an affirmative duty to exercise reasonable diligence in investigating violations it suspected, and its failure to do so cannot avoid a finding of laches.  *See General Bedding Corp. v. Echevarria*, 947 F.2d 1395, 1397, n.2 (9th Cir. 1991); *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983) ("Because plaintiff and defendant advertised in the same magazines and exhibited at the same trade

fairs, plaintiff had ample opportunity to discover defendant's
activities before defendant developed a substantial business.").

The operative facts asserted in CollegeNET's June 10, 2004
complaint are the following: (i) in order to submit an application
through a Mentor site, a student must first establish an account
with XAP and provide personal information to XAP (para. 7); (ii)
XAP provides students' data to lenders who fund the development
and operation of the Mentor sites (paras. 8-14); (iii) XAP does
not charge colleges or students for processing applications
through the Mentor sites (para. 8); (iv) XAP discloses students'
data to lenders without their express consent and direction
(paras. 17-18); and (v) XAP falsely represents to colleges that it
does not disclose students' data to third parties without their
express consent and direction (paras. 20-24).  (*See* Declaration of
Kimberly I. Culp in Support of XAP Corporation's Post-Trial
Brief,[1] Ex. A, Complaint, Case No. 3:04-CV-00793-HU.)  The facts
asserted in the complaint as the bases for the Lanham Act claim
did not include any references to the opt-in question.  *Id.*

CollegeNET knew or should have known the recited bases for its
claim as of 1999, and certainly before June 10, 2002.  The
complained-of advertising, which consisted of statements to the
effect that XAP shares user information only with the user's
"express consent and direction," has appeared in substantially the
same form on publicly accessible pages of XAP's Mentor sites since
early 1999.  XAP's privacy policies have included the "express
consent and direction" language since at least February 1999 (Ex.

---

[1] "Ex." as used herein refers to the Exhibits to the Culp
Declaration.

B,[2] 970:17-18, 993:9-994:20; Ex. C, 116:13-22), as have XAP's "What Is a Mentor System?" introductory web pages (Ex. C, 116:23-117:22).[3]

As of January 2000, XAP had five Mentor sites, three of which had sponsors and used an opt-in question to identify users interested in receiving additional information and to obtain consent to share user data with sponsors.  (Ex. C, 107:10-15, 120:4-11.)  The first of these sites was launched in February 1999.  (Ex. B, 982:10-14.)  As of 2001, there were thirteen such sites.  (Ex. C, 120:4-11.)  Each required users to create an account with XAP and respond "yes" or "no" to one or more opt-in questions in order to access online applications and other features of the sites.  (Ex. C, 120:12-121:23.)  The account creation screens were publicly accessible pages of XAP's Mentor sites, and anyone could create an account to explore the sites' features and functionality free of charge.  (*Id.*)

At trial, CollegeNET's Mr. Wolfston and Mr. Carmody testified that they personally monitored their company's competitors (Ex. B, 499:3-25, 775:16-776:8; Ex. C, 189:19-191:9), and that as early as 1996 CollegeNET considered XAP a competitor (Ex. B, 499:12-21; Ex. C, 189:14-17).  Mr. Wolfston acknowledged that he knew how to create an account on XAP's Mentor sites and that four or five other CollegeNET employees actually created accounts.  (Ex. C,

---

[2] Exhibit B to the Culp Declaration contains excerpts from the Jury Trial transcript; Exhibit C contains excerpts from the Bench Trial transcript on January 25, 2007; Exhibit D contains excerpts from the Bench Trial transcript on January 26, 2007.
[3] CollegeNET claims that statements appearing in XAP's privacy policies and on its "What Is a Mentor System?" pages are "advertising" or "promotion" for purposes of 15 U.S.C. §1125(a)(1)(B).

XAP's POST-TRIAL BRIEF

207:21-208:7.)  Mr. Wolfston also admitted that XAP's privacy
policies, posted on its Mentor sites since at least February 1999,
"raised [his] antenna." (Ex. C, 207:13-20.)

CollegeNET's documents reflect its close monitoring of its
competitors' data practices and its familiarity with the use by
some competitors of opt-in and opt-out questions to obtain user
consent to share information with third parties, the very practice
CollegeNET claims makes *XAP's* statements false and misleading.  As
early as 1999, Mr. Wolfston complained about some CollegeNET
competitors using opt-out boxes to gain consent from students for
"data mining." (Ex. E,[4] DFX 1262 at CNA05085: "I don't think
students, families, or administrators fully understand the
implications of 'opt-out' check boxes and other strategies for
'data mining'"; *see also* Ex. E, DFX 1621 at CNA47628.)  Indeed,
Mr. Wolfston's February 2000 email to an admissions official at
Stanford University reflects not only his thorough familiarity
with and detailed investigation of his competitors' practices, but
also his belief that competitors were sharing user information
with third parties. (*Id.*, DFX 1621 at CNA47628; Ex. C, 193:10-
196:12.)[5]  Had Mr. Wolfston or his colleagues at CollegeNET seen
an opt-in question on XAP's account creation pages – and surely
they did – they would have known, or at the very least suspected,
it was being used to obtain consent.

CollegeNET's suspicions of XAP were not confined to XAP's use

---

[4] Exhibit E to the Culp Declaration contains cited exhibits
received in evidence during the jury and bench trials.
[5] CollegeNET sued Embark for false advertising in April 2001, well
before the June 10, 2002 laches date. (Ex. C, 196:11-12.) (*See*
XAP's Request for Judicial Notice, filed herewith.)

of an opt-in question.  Mr. Wolfston admitted that he believed XAP
was "providing loan guarantors with leads from admissions data"
when he learned that a former EFG employee, Michael Robison, had
joined XAP, because while at EFG Mr. Robison had solicited
CollegeNET user data for marketing purposes.  (Ex. E, DFX 1216 at
LCC01071; Ex. C, 131:13-18.)  Mr. Robison joined XAP in February
2000, more than four years before CollegeNET filed its Lanham Act
claim.  (Ex. C, 131:17-18.)

As of at least July 2001, Mr. Wolfston believed that XAP was
"selling" student data.  He testified during the jury trial that
he "assum[ed] [XAP was] doing some kind of selling of student
data" and had a conversation with Allen Firstenberg about it
"shortly after TMP Worldwide had acquired fastweb.com."  (Ex. B,
508:12-509:13.)  Mr. Wolfston admitted this acquisition occurred
in June 2001 and was announced in July 2001.  (Ex. D, 5:14-6:20.)
At the bench trial, Mr. Wolfston tried to obfuscate the timing of
his conversation with Mr. Firstenberg (*Id.*, 5:22-6:7), but his
testimony when questioned by his own counsel during the jury trial
was unequivocal – he placed the timing of the conversation
"shortly after TMP Worldwide had acquired fastweb.com."  His
belief that XAP was "selling" student data necessarily preceded
the alleged conversation.

An internal CollegeNET email form Mr. Wolfston on December 29,
2002, reveals that CollegeNET certainly knew of its claim *by that
date* and not, as it now claims, in March or May 2004:

> Unlike the CSU deal which puts strict privacy
> restrictions on use of data by XAP and is paid for by
> CSU, most every other mentor portal is "sponsored" by a
> bank or loan guarantor.  **And what the loan guarantors buy**

> **from XAP is leads.  But again, like Embark.com, this fact is not something XAP readily divulges.**

(Ex. E, DFX 1303 at CNA39696, emphasis added.)  CollegeNET did not have access to internal XAP business information, the claimed basis for its June 2004 filing, when Mr. Wolfston wrote this email.[6]

Clearly, CollegeNET had adequate knowledge of XAP's statements and practices, without the benefit of discovery of non-public information from XAP, well before June 2002.  Nevertheless, had it desired to investigate its suspicions, CollegeNET could have obtained multiple XAP contracts with state agencies, all of which were subject to public disclosure.  (*See* Ex. D, 14:14-15:7.)[7] Additionally, had it desired to know more about how XAP obtained consent to share user data, information XAP regularly discussed at kick-off meetings and in communications with colleges, CollegeNET had only to inquire.  (Ex. B, 759:9-762:3, 997:6-21.)  It did not.

CollegeNET claimed at trial that XAP was its primary competitor.  It is inconceivable that a company so intensely concerned with tracking its competitor's activities did not know for years, or could not have easily discovered, XAP's statements about and practices for handling user information, in order to test its strong suspicions that XAP was misleading colleges and

---

[6] Mr. Wolfston claimed that he did not know of CollegeNET's Lanham Act claim until Mr. Jacobson's deposition in 2004.  (Ex. D, 25:14-22.)  However, the record contains no evidence of what information was revealed in the deposition or how, if at all, it supplied a necessary element of CollegeNET's claim.

[7] For example, the KHESLC contract cited in CollegeNET's Fourth Amended Complaint was signed in October 25, 1999.  (Ex. E, DFX 1261 at 716; Ex. A, Complaint.)  CollegeNET, in fact, obtained this contract through a public records request in 2004, but it could have, and should have, made the request sooner.  (Ex. D, 22:16-23:4.)

students.   There is no excuse for CollegeNET waiting until June 2004 to assert its false advertising claim.

The prejudice from CollegeNET's unreasonable delay is not only presumed, but demonstrable and substantial.   A defendant is prejudiced if it can show that it took actions or suffered consequences it would not have had the plaintiff promptly brought suit (expectations-based prejudice), or if it suffers the effects of degraded evidence, including witnesses who are now unavailable (evidentiary prejudice).   *See, e.g., Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955-56 (9th Cir. 2001).

CollegeNET waited until June 2004 to file its false advertising claim, three months after XAP's founder and CEO, Allen Firstenberg, died.   Mr. Firstenberg was instrumental in the development of XAP's sponsorship business model, its privacy policies, and its practices related to the handling of user information.   CollegeNET has repeatedly cited Mr. Firstenberg's writings and his purported oral statements in support of its claim, and XAP's prejudice in defending against these charges as a consequence of Mr. Firstenberg's absence is obvious.   (*See* Ex. C, 139:20-143:9.)   XAP is entitled to a finding that laches applies.

## IV. COLLEGENET IS NOT ENTITLED TO MONETARY DAMAGES FOR ITS LANHAM ACT CLAIM

### A.   Lanham Act Damages Are Intended to Be Compensatory and Require Proof of Actual Deception and Actual Injury

Lanham Act damages are awarded to compensate an injured party. 15 U.S.C. §1117(a).   They must neither punish the defendant, *id.*, nor provide a windfall to the plaintiff, *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 917-18 (Fed. Cir. 1984).

Indeed, an injunction may be a fully adequate remedy, particularly where there is "an inconclusive showing that the actions complained of did in fact cause actual damage to the plaintiff." *Bandag Inc.*, 750 F.2d at 917. In this case, CollegeNET seeks monetary damages in the form of both its own alleged lost profits and disgorgement of XAP's alleged profits. It is not entitled to recover either absent proof of actual deception and actual injury.

CollegeNET may not rely on a "tendency" of XAP's statements to deceive or a "likelihood" of injury to support an award of damages under the Lanham Act; it must satisfy a higher standard of proof.[8] *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993); *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989). As Professor McCarthy has explained:

> If plaintiff seeks damages based upon its own lost sales or upon defendant's profits, plaintiff is faced with the traditional problems of proving an actual diversion of customers from itself to defendant. **Compared to the showing necessary to obtain an injunction, a higher standard of proof is required to recover damages. For example, plaintiff must prove that at least some customers have been actually deceived, and that [it] has been injured by reason of actual consumer reliance on the false advertising.**

5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §§27:42, 27-89, 27-90 (4th ed. 2006) (emphasis added).

The Court instructed the jury that CollegeNET had to prove that XAP's statements "actually deceived *or* had the tendency to deceive a substantial segment of the relevant purchasing public"

---

[8] The standard of a "tendency to deceive" or a "likelihood of injury" is applicable when the plaintiff seeks an injunction, but not when monetary damages are sought. 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §27:31 at 27-57-61 (4th Ed. 2006); *see, e.g., Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1335 (8th Cir. 1997).

and that "CollegeNET has been *or* is likely to be injured ..." (Ex. B, 1907:25-1908:6). Because the instruction did not *require* the jury to find actual deception and actual injury, the jury's verdict finding a violation of the Lanham Act does not satisfy the standard of proof required for damages, and its advisory award of $4.5 million cannot be adopted without additional findings by the Court that substantial evidence establishes actual deception and actual injury.

CollegeNET disputes that it is required to prove actual deception and actual injury to recover damages, citing the absence of such a requirement in *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997). *Southland Sod* is distinguishable, however, as it concerns a claim for damages in a case of false *comparative* advertising, in which the Ninth Circuit has approved consideration of the "totality of the circumstances" in lieu of proof of actual damage. *Id.* at 1146. However, when a defendant falsely advertises its own product, proof of actual deception and injury must be shown. *Harper House*, 889 F.2d at 209 n.8 (actual injury should be required "when advertising does not directly compare defendant's and plaintiff's products, when numerous competitors participate in a market, or when the products are aimed at different market segments ..."); *see also Balance Dynamics Corp. v. Schmitt Industries*, 204 F.3d 683, 690, 694, 695 n.6 (6th Cir. 2000) (requiring proof of actual injury when false advertising not comparative) (citing *Harper House*); *Porous Media Corp.* 110 F.3d at 1336.

XAP is accused of falsely advertising its own service – not

falsely comparing its services to another's.  An award of damages without proof of actual deception and actual injury invites a speculative award and a windfall to CollegeNET that the Ninth Circuit and other circuits have not permitted.

### 1. CollegeNET Did Not Prove Actual Deception

There is *no* evidence that anyone was actually deceived by XAP's challenged statements.  No representative of any college or university testified to any such deception; neither did any student or other user of XAP's Mentor sites.[9]  In the total absence of such evidence, CollegeNET relies solely on surveys of college representatives conducted by its long-time marketing strategist, Charles Colby.  (Ex. B, 744:11-24.)  However, these surveys did not test any of the *statements* CollegeNET claimed were false advertising.  Survey respondents (at least half of whom were unfamiliar with XAP, let alone XAP's statements) were never shown the text of XAP's statements either alone or in context, nor were they asked questions to ascertain what understanding, if any, they acquired as a result of their exposure to the statements.  (Ex. B, 713:9-21, 741:3-743:15.)  Instead, respondents were asked how they viewed certain *practices*.  (*Id.*, 743:5-744:10.)  *See Lanphere Enters. v. Jiffy Lube Int'l*, No. CV 01-1168-BR, 2003 U.S. Dist. LEXIS 16205, at *33-34 (D. Or. July 9, 2003) (survey evidence inadmissible because it failed to test relevant issue).  If the

---

[9] To the contrary, Brian Williams of the University of North Carolina, the only "customer" representative who provided relevant testimony, stated that he was familiar with the opt-in question and knew that XAP shared student data when users answered "yes."  (Ex. B, 1065:9-1066:4.)  Similarly, Jonathan Brown of the Association of Independent California Colleges and Universities, an association of "customers," testified that he understood the opt-in question was used to obtain consent.  (*Id.*, 1045:4-1046:17.)

surveys contributed anything meaningful to the evidence at trial,
they at most might be viewed as providing some tenuous support for
CollegeNET's claim that XAP's statements would have a "tendency to
deceive," but such evidence, even if viewed as credible and
relevant, is insufficient to prove that any college or university
was actually deceived by XAP's statements.

### 2.  CollegeNET Did Not Prove Actual Injury

There also is no evidence that XAP's *statements* (as opposed to
some other conduct or factor) actually injured CollegeNET. *See*
*William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 257-58 (9th
Cir. 1995) (plaintiff cannot establish causation unless it can
show that the false statement caused the damage by influencing the
purchasing decision).  CollegeNET has not proven that the relevant
purchasing public used XAP's services *because of* XAP's challenged
statements and that, but for the statements, the purchasing public
would have used CollegeNET's services instead.  CollegeNET's own
witnesses testified that CollegeNET lost business to XAP because
XAP offers its online application services at no cost to colleges,
*not* because XAP falsely advertised its handling of user
information.  (Ex. B, 504:10-505:8, 778:5-781:13, 785:17-786:2.)

There is *no* evidence that even a single college actually chose
XAP in reliance on the challenged statements; that XAP's
statements influenced in any respect any college's decision to use
XAP's services; or that had it known the statements were false or
misleading a college would have chosen another vendor.  CollegeNET
has not proved it was actually injured. *See Balance Dynamics*, 204
F.3d at 694 (failure to prove actual harm where "no customers had

13        XAP's POST-TRIAL BRIEF

ever informed [plaintiff] that [plaintiff] was losing a sale *due to* the [defendant's] communications") (emphasis added).

CollegeNET asks the Court to infer causation, contending that XAP was able to offer its services at no cost to colleges only because XAP secretly "sold" student data.  This inference is untenable.  It is undisputed that 85% of the applications XAP handles come from users who established accounts on sites that did not present an opt-in question and therefore never even had the possibility of any of their data being exposed to third parties. (Ex. B, 1721:16-19.)  Over the history of the company, only 10% of XAP's registered users answered "yes" to an opt-in question, a condition to any sharing of data.  (Ex. B, 936:14-24.)  XAP's business model does not depend upon the "sale" of student data; rather, XAP is able to offer its services free to colleges because it obtains funding from sponsors at the state- or system-wide level.  (Ex. B, 932:16-933:7, 990:17-992:25.)

XAP's Mentor sites are more than conduits for processing student applications.  (Ex. D, 31:4-33:11.)  As XAP's expert Dr. Lynde explained, the sites have the broader purpose of promoting broad access to higher education.  (*Id.*, 31:21-32:6.)  Because of its different business model, XAP typically can offer free application services to the colleges associated with a Mentor, whereas CollegeNET's revenue stream depends on charging colleges $5-$6 per application.  (*Id.*)  Ninety-two percent of XAP's revenue comes from government agencies and educational systems or associations, whereas 86% of CollegeNET's revenue comes directly from individual colleges.  (*Id.*, 33:14-25.)  CollegeNET has never

been successful obtaining business at the state- or system-wide
level, where XAP's marketing efforts are directed, because
CollegeNET's websites lack the features and functions states and
school systems find desirable. (*See, e.g.*, Ex. E, DFX 1277; Ex.
B, 983:6-988:7.)  It is the richer content of XAP's websites and
XAP's business model directed towards a different purchasing class
than CollegeNET's – and not XAP's statements about its handling of
student data – that gave XAP an advantage over CollegeNET in the
marketplace.  *See, e.g.*, *St. Charles Mfg. Co. v. Mercer*, 737 F.2d
891, 893 (11th Cir. 1983) (where plaintiff only sold kitchen
cabinets, it did not prove lost profits against defendant who sold
homes; "[t]he ultimate purchasers bought new homes with kitchen
cabinets in them.  The defendants did not usurp any sales from
plaintiffs to these purchasers of homes.").

## V.  LOST PROFITS WILL COMPENSATE COLLEGENET FOR ANY HARM IT SUFFERED

### A.  An Award of Lost Profits Is an Equitable Remedy Determined by the Court

In the event CollegeNET is found to be entitled to an award of
lost profits, the Court should determine the amount.  As 15 U.S.C.
§1117(a) makes clear, a prevailing plaintiff is entitled to
damages "subject to the principles of equity" and "[t]he court
shall assess such profits and damages or cause the same to be
assessed under its direction."  15 U.S.C. §1117(a).  The Ninth
Circuit has interpreted this statute to mean that the remedy for
false advertising is an equitable issue for the judge to decide.
*See Jarrow*, 304 F.3d at 836.  The legislative history of Section
1117 indicates that "the court shall assess ... under its

direction" language was intended simply to invoke the "normal principles of equity." *See* Hearings on H.R. 102, H.R. 5461 and S. 895 Before the Subcommittee on Trademarks of the House Committee on Patents, 77th Cong., 1st Sess. 228 (1941) (Statement of Milton Handler); *see also Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 205-6, n.1 (1942) (construing Section 19 of the predecessor Trademark Act's use of identical language as providing for "proceedings in equity"). Although the Court may make use of an advisory jury (*see* Rule 39(c)) or obtain the assistance of a magistrate judge or special master (*see* 28 U.S.C. §631(b)(1)(B); Rule 53), it may not delegate its equitable authority to a jury.

### B. CollegeNET Waived Any Claimed Right to a Jury Trial on Lost Profits

CollegeNET now contends it had a right to a jury trial on its claim for lost profits and that the Court is bound by the jury's finding. (Ex. C, 28:17-29:9.) Even if it had such a right (which it did not), CollegeNET has waived it.

Conduct of a party "that evinces consent and appears on the record is sufficient to constitute a proper withdrawal and waiver [of the right to a jury trial]." *White v. McGinnis*, 903 F.2d 699, 701 (9th Cir. 1990) (*en banc*). Failure to object to a bench trial on certain issues, when a trial is bifurcated, until after discharge of the jury has been held to constitute waiver. *Pope v. Savings Bank of Puget Sound*, 850 F.2d 1345, 1354-55 (9th Cir. 1988). Additionally, failure to object to a pretrial order setting a bench trial until the eve of the bench trial has been held to constitute waiver of the jury trial right. *Sewell v.*

*Jefferson County Fiscal Court*, 863 F.2d 461, 463-64 (6th Cir. 1988) (four-month delay constituted waiver).

During proceedings on September 20, 2006, the question of whether the jury would be permitted to make an advisory determination of Lanham Act damages was discussed at length. (Ex. B, 21:10-28:19.) When asked why he wanted the jury to consider CollegeNET's lost profits claim, CollegeNET's counsel cited the "significant and meaningful guidance" the jury would provide to the Court. (*Id.*, 21:17-22:4.) During argument on the parties' Rule 50 motions, CollegeNET's counsel again referred to the jury's anticipated verdict on Lanham Act damages as advisory and made no objection to its being considered so. (Ex. B, 1798:14-1799:12; *see also id.*, 1841:16-1842:1.) CollegeNET did not thereafter object to the advisory nature of the verdict before the jury was discharged.

In CollegeNET's section of the Proposed Supplemental Pretrial Order, lodged with the Court on December 22, 2006 in advance of the bench trial, CollegeNET contended that "[t]he Jury's award with regard to Lanham Act damages was advisory to the Court. CollegeNET contends that it is entitled to a damages award greater than $4.5 million, for which it will offer evidence at the bench trial." (Proposed Supplemental Pretrial Order, Dkt. 598 at 6.) During the pretrial conference on January 12, 2007, CollegeNET reiterated its position that the jury's verdict was advisory. (Ex. F, 8:1-9.) CollegeNET did not object on the record to the advisory nature of the verdict until after the bench trial commenced. (Ex. C, 28:17-29:9.)

CollegeNET's repeated acquiescence in an advisory-only jury verdict on its Lanham Act lost profits claim, its failure to object to the bench trial on this claim until months after the jury was discharged, and its insistence in the Proposed Supplemental Pretrial Order and during the pretrial conference that the jury's verdict was only advisory constitute a clear waiver of any right it may have had to a jury trial.

If the Court were now to hold that CollegeNET did not waive whatever Seventh Amendment right it now claims, XAP would be prejudiced.  At the beginning of the jury trial, XAP asserted the right to have the jury decide its statute of limitations defense if Lanham Act damages were determined by the jury.  (Ex. B, 16:2-17:3.)  The Court ruled that the jury should not hear evidence concerning the statute of limitations defense because the Court, not the jury, would determine Lanham Act damages.  (*Id.*, 31:4-32:1.)  Accordingly, XAP was not permitted to present to the jury its extensive evidence of CollegeNET's unreasonable delay in filing suit, and XAP's damages expert did not explain to the jury how the lost profits calculation would be affected by the applicable limitations period.  If the Court accepts CollegeNET's untimely assertion of a right to a jury trial on the lost profits issue and adopts the jury's award, XAP will have been denied its right to a jury trial on its corresponding statute of limitations defense.

**C.  Compensatory Damages Should Be Limited to No More Than $893,199**

The Court's calculation of lost profits is governed by the rule that an award of monetary damages must be compensatory only.

(*Supra*, Section IV.A.)

It is unclear whether CollegeNET has abandoned its earlier claim for lost profits in the amount of $34,886,339, and now only advocates adoption of the jury's advisory award of $4.5 million. Either amount would provide a windfall to CollegeNET and be punitive to XAP.  To the extent CollegeNET is entitled to lost profits at all, the award should not exceed $893,199 (Ex. B, 1722:3-9), which is the maximum amount of lost CollegeNET profit that might be attributable to XAP's asserted false advertising.

CollegeNET claims to have lost profits on every application XAP processed from 1999 to the date of the jury trial, regardless of whether there were any challenged statements made in relation to those transactions.  (Ex. B, 871:5-10, 873:4-875:12.)  XAP's expert, Dr. Lynde, calculated damages arising from transactions where there was a possibility of disclosure of user data to third parties and, therefore (according to CollegeNET's theory of the case), a possibility of injury arising from the statements at issue.  It is uncontested that "85% of all XAP's transactions start at Mentor sites that have no opt-in question." (*Id.*, 1721:8-1722:9.)  Relying on this percentage, and other corrections to CollegeNET's analysis, Dr. Lynde calculated CollegeNET's lost profits as $893,199 for the period of time from 1999 to 2006.

CollegeNET's expert, Mr. Partin, improperly includes *all* applications XAP processed in his lost profits calculation.  (Ex. B, 871:7-10.)  This method produces a windfall for CollegeNET because it encompasses transactions where no false or misleading advertising, and hence no injury to CollegeNET, could possibly

have been involved.  Mr. Partin's calculation includes per application "lost profits" for applications processed by XAP from users who registered on Mentor sites, like CSU Mentor and CCC Apply, where user information was never disclosed to a third party.  (*Id.*, 873:4-875:12, 877:7-878:8.)  Mr. Partin purports to justify his grossly over-inclusive calculation by asserting that XAP would have gone out of business but for its alleged false statements, and that CollegeNET then would have gotten its market share of *all* of XAP's application business.  (*Id.*, 874:19-20.) There is absolutely no support for this claim in the record.

Mr. Partin's analysis also improperly includes $11,000,442 as "future lost profits."  (Ex. B, 873:4-874:10.)  This calculation is based on the assumption that any injunction CollegeNET might obtain would be an ineffective remedy because customers are "sticky" – meaning they are unlikely to switch online application vendors.  (*Id.*, 871:7-875:12.)  There is no basis for Mr. Partin's assumption that an injunction precluding future false advertising by XAP would be ineffective; indeed, Mr. Partin's own assertion that XAP would go out of business if it could not deceptively sell user information conflicts with this view that XAP would remain in business and retain customers.  The evidence clearly shows that colleges are not "sticky."  (Ex. E, DFX 1310, 1284, 1299.)  Mr. Wolfston himself testified that Stanford University switched vendors three times in three years.  (Ex. C, 197:6-199:25.) Mr. Sexton, Dean of Admissions at Lewis & Clark College, also testified that it would only take six months for his institution to switch vendors.  (Ex. B, 202:21-203:8.)  Jessica Wagoner, XAP's

Director of Client Services, testified that most schools using XAP's application simultaneously used another vendor or their own online applications. (*Id.*, 1317:5-10.) Even Mr. Partin conceded that colleges use multiple vendors and/or an in-house solution and would have alternatives available were they no longer willing or able to use XAP. (*Id.*, 899:17-901:6.) "Future lost profits" are not only unlikely but highly speculative.

When calculating market share, Mr. Partin incorrectly assumes that colleges would not use in-house online applications as an alternative to outsourcing applications to a vendor (Ex. B, 876:7-20), and he omits from his calculation a large portion of the relevant market. Colleges unquestionably do use in-house applications and do select this solution as an alternative to a third-party vendor. (Ex. E, DFX 1268, 1271, 1297, 1310, 1293; Ex. B, 901:4-6.) Mr. Partin's flawed market share analysis exaggerates the amount of CollegeNET's lost profits.

Most egregiously, Mr. Partin assumes that all colleges and universities using XAP for free would be willing to pay another vendor at least $5, and as much as $7, per application. (Ex. B, 1720:2-23.) But Mr. Partin fails to calculate the elasticity of demand from $0 to 5 or $0 to $7; he considers only the elasticity of demand over a narrow range of prices from $5 to $7. (*Id.*, 863:21-864:3.) As there is no evidence suggesting that XAP's customers (receiving applications without charge) would have been willing to pay CollegeNET or any other vendor any sum of money were XAP unavailable, Mr. Partin's unsupported price erosion calculation overstates CollegeNET's lost profits by over $12

million. (*Id.*, 875:4-12.)  *See Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1378-79 (Fed. Cir. 2003).[10]

### D.  The Court Should Not Award Damages For Any Claimed Loss Prior to June 10, 2002 or After 2004

CollegeNET's monetary recovery, if any, should be limited to those damages which accrued between June 2002 and the end of 2004. For the reasons discussed in detail in Section III, above, CollegeNET is not entitled to damages for any harm accruing prior to June 10, 2002, the outer limit of the applicable two-year limitations period.  *See Jarrow*, 304 F.3d at 837 n.5. (monetary damages outside the limitations period may not be recovered).

CollegeNET cannot prove actual injury after mid-2004.  The undisputed evidence demonstrates that after CollegeNET filed its Lanham Act claim and accused XAP of making false statements, XAP's business actually *increased*.  (Ex. B, 1719:3-19.)  Even if XAP's statements could be considered material prior to June 10, 2004, CollegeNET's extensive publicity of its allegations, XAP's additional disclosures to its clients and customers, and the resulting increase in XAP's business show that the statements were not material after that date.  (Ex. B, 1374:10-1376:14, 1718:22-1719:25; Ex. C, 134:17-139:19; Ex. E, PTX 95, DFX 1252.)  For example, the Oklahoma Board of Regents, after being fully apprised in July 2004 by CollegeNET of its allegations that XAP engaged in

---

[10] Mr. Partin uses the price charged by ApplyYourself, a competitor in the existing market, as his benchmark for price erosion and disregards the availability of in-house online applications.  (Ex. B, 856:2-859:15, 873:4-875:12.)  ApplyYourself's price is not an appropriate benchmark.  *See Grain Processing Corp. v. American Maize Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999) ("[c]onsumer demand defines the relevant market and relative substitutability among products therein").

false advertising (Ex. E, DFX 1241), chose to contract with XAP instead of CollegeNET. (Ex. B, 804:10-806:6.)

CollegeNET's lost profits, if any, restricted to the applicable limitations period are $884,108 for the period June 10, 2002 through June 30, 2006 (the date of the most recent available financial data).[11] If CollegeNET's profits are further restricted to the period of time XAP's statements could have been material to the purchasing public (*i.e.*, before extensive publicity of CollegeNET's accusations), its lost profits are $431,430 for the period June 10, 2002 through December 31, 2004.[12]

## VI. COLLEGENET IS NOT ENTITLED TO DISGORGEMENT OF XAP'S PROFITS

### A. Disgorgement of XAP's Profits Is Improper

The Ninth Circuit has not directly considered whether the award of defendant's profits can *ever* be an appropriate remedy in cases of false advertising where the advertising is not comparative. *See, e.g., Harper House*, 889 F.2d at 209 n.8 ("We leave to the future the question of how damages should be calculated in a section 43(a) claim that a defendant advertised a different (and allegedly better) product than they delivered."). However, in trademark infringement actions under the Lanham Act, where disgorgement is not sought as a proxy for plaintiff's lost profits, the Ninth Circuit has required proof of willfulness. *See*

---

[11] XAP indicated in the Proposed Supplemental Pretrial Order that it planned to present this calculation at the bench trial, and CollegeNET did not object. (Proposed Supplemental Pretrial Order at 9.) XAP was not permitted to present evidence of lost profits at the bench trial, although it was prepared to do so. (Ex. D, 29:4-30:4.) XAP asks that the Court consider this evidence now. (XAP's Offer of Proof, filed herewith.)
[12] To be conservative, XAP's damages expert extended this calculation beyond mid-2004 through the end of 2004. (XAP's Offer of Proof, filed herewith.)

*Lindy Pen*, 982 F.2d at 1406 (for an award of defendant's profits willful infringement is required and "[c]ourts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard").

Because Lanham Act remedies are intended to be compensatory only, "the recovery of both plaintiff's lost profits *and* disgorgement of defendant's profits is generally considered a double recovery," and therefore impermissible, particularly where disgorgement has not served as a proxy for lost profits that were difficult to calculate. *See Nintendo of America, Inc. v. Dragon Pacific International*, 40 F.3d 1007, 1010 (9th Cir. 1994); *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 124 (9th Cir. 1968); *see also* 5 J. Thomas McCarthy, McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §30:73, 30-168-69 (4th ed. 2006).

The possibility that disgorgement might result in a windfall to the plaintiff requires that courts carefully evaluate the equities of permitting such an award.  As the United States Supreme Court has held with respect to the Trademark Act (the Lanham Act's predecessor), "the character of the conduct giving rise to the unfair competition is relevant to the remedy which should be afforded." *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 130 (1947).  Based on the Supreme Court's interpretation of the Trademark Act, courts have "almost unanimously required some showing of egregious conduct or intent by the infringer before an accounting of profits will be granted" under the Lanham Act.  5 J. Thomas McCarthy, McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §30:61, 30-138-39, 30-140 (4th ed. 2006); *Bandag*, 750 F.2d at 918

(essential to rely "not merely on the legal conclusion of liability, but also to consider the nature of the infringing actions, *including the intent with which they were motivated and the actuality, if any, of their adverse effects upon the aggrieved party.*")(applying Ninth Circuit law) (emphasis added); *see also George Basch Co., Inc. v. Blue Coral Inc.,* 968 F.2d 1532, 1540 (2d Cir. 1992).

Disgorgement awards under the Lanham Act (which covers, for example, trademark infringement and counterfeiting, as well as false advertising) have been limited to cases "where the defendant palmed off its goods as made by the plaintiff or otherwise infringed the plaintiff's rights rather than engaged simply in false advertising of the defendant's own product." *Burndy Corp. v. Teledyne Industries, Inc.,* 748 F.2d 767, 772 (2d Cir. 1984); *see Champion Spark Plug,* 331 U.S. at 131. In such cases, defendant's profits have been awarded to successful plaintiffs under a theory of unjust enrichment or to deter a willful infringer. However, the rationale for such awards is that because a trademark (or other right) is a *property* interest, any profits from the use of the trademark have been held in trust by the defendant. *See Maier Brewing,* 390 F.2d at 121, 123; *Burndy,* 748 F.2d at 772 (limited to cases where plaintiffs rights were infringed). By contrast, a plaintiff like CollegeNET, who complains of another's false advertising has no property interest at stake, and the rationale supporting the award of defendant's profits does not apply.

In summary, disgorgement is only available in non-comparative

false advertising cases, such as this, in two circumstances:
(i) where it serves as a proxy for actual damages where the
plaintiff cannot prove its lost profits or increased costs
attributable to the defendant's advertising, or (ii) where the
plaintiff claims injury to an intangible interest, such as loss of
goodwill, attributable to the advertising that is not otherwise
remedied by an award of actual damages.  In either such
circumstance, equity requires a finding that the defendant acted
willfully.  Disgorgement may not be awarded on a theory of unjust
enrichment or to punish a defendant except to remedy a violation
of the plaintiff's *property* interest.

### 1.    The Court May Not Award Disgorgement Because It Would Overcompensate CollegeNET

CollegeNET makes no claim that it is unable to prove its own
lost profits and that it must resort to XAP's profits as a proxy
for actual damages.  CollegeNET also makes no claim of injury to
an intangible interest, such as loss of goodwill.  The Court can
fairly remedy CollegeNET's loss, if any, by awarding CollegeNET
its lost profits without also requiring XAP to disgorge its own
profits.  *See Maier Brewing*, 390 F.2d at 123; *Highway Cruisers of
California, Inc. v. Security Industries, Inc.*, 374 F.2d 875, 875-76
(9th Cir. 1967).  Where disgorgement would serve no compensatory
purpose, an award of both lost profits and disgorgement would be
inequitable and improper.  *Nintendo of America*, 40 F.3d at 1010.

### 2.    The Court May Not Award Disgorgement Because XAP's Advertising Was Not "Willful"

Even assuming CollegeNET establishes that the disgorgement
claimed is compensatory (it is not), it cannot obtain disgorgement

from XAP without proof XAP's challenged advertising was "willful."
*See Lindy Pen*, 982 F.2d 1406.  Willfulness, like proof of
exceptionality, must be made by clear and convincing evidence.
*Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d 1210, 1217
(9th Cir. 2003); *Seven-Up v. Coca-Cola*, 86 F.3d 1379, 1390 (5th
Cir. 1996).  A statement deliberately made but erroneously
believed to be permissible is not a "willful" statement.  *Highway
Cruisers of California*, 374 F.2d at 876.  Instead, willfulness
requires a showing of deliberate intent to deceive, or bad faith.
*Lindy Pen,* 982 F.2d at 1406.

There is no evidence, let alone clear and convincing evidence,
that XAP acted willfully, with intent to deceive the colleges and
universities that comprise the purchasing public.  When XAP
developed its privacy policies, including its statements about how
it handles the disclosure of personal information, it sought to
place itself in the mainstream of online businesses.  Kara
Petreccia, XAP's Vice President of Operations, testified that in
developing XAP's early privacy policies in 1999 she reviewed other
websites' policies and data sharing procedures and concluded that
XAP should use an "opt-in" mechanism to obtain consent.  (Ex. B,
995:7-9.)  She reasoned that the affirmative action of clicking
"yes" in response to an opt-in question indicated express consent.
(*Id.*, 993:9-994:24.)

XAP did not hide its sharing of information with sponsors or
its use of the opt-in question to obtain consent.  Romualdo Teh,
XAP's Director for Program Management, testified that he typically
explained the opt-in question at Mentor kick-off meetings attended

by eligible colleges and universities and disclosed with whom information would be shared. (Ex. B, 761:12-17.) After CollegeNET filed its false advertising claim, XAP immediately prepared letters addressed to its college and university clients, partners and sponsors explaining in detail the circumstances in which personal information of users could be disclosed, including a statement that "[p]ersonal information regarding account holders on XAP's Mentor sites is released ... to ... Mentor sponsoring entities, but only if the students affirmatively request information about financial aid and student loans at the time they create an account." (Ex. E, PTX 95, DFX 1252.) Even the Federal Trade Commission agreed that XAP's statements were not deceptive and declined CollegeNET's request that it take action against XAP. (Ex. E, DFX 1253; Ex. B, 348:4-24, 349:12-352:5.)

Mr. Jacobson, XAP's Chief Financial Officer, explained that XAP tried to learn from the industry and pattern its practices after what other responsible websites were doing (Ex. C, 79:12-23), and that when XAP saw "an area where [it could] improve the language, [it did]" (*Id.*, 78:15-79:11). Like Ms. Petreccia, when Mr. Jacobson joined XAP in January 2000, he supervised a comparison of XAP's privacy policies to the policies on other websites. (*Id.*, 111:10-22.) He also looked at the Federal Trade Commission's publication on privacy and revised XAP's privacy polices to conform to his understanding of what the FTC required. (*Id.*) Recognizing he lacked expertise in the area of online privacy, Mr. Jacobson engaged outside counsel with internet law expertise, Pillsbury, Madison & Sutro, to advise XAP on its

privacy policies and practices.  (*Id.*, 112:1-114:21; Ex. E, DFX
1718.)  A Pillsbury partner reviewed the policies in the context
of XAP's existing Mentor sites, and XAP incorporated her
recommendations.  (Ex. C, 114:5-115:4.)

CollegeNET relies heavily on PTX 233, an unauthenticated,
document of unknown authorship retrieved from Mr. Firstenberg's
computer after his death.  (Ex. G, 105:3-111:18.)  This document,
which appears to refer to XAP's earliest sites (TexasMentor was
launched in 1999) characterizes an unidentified individual as
believing some proposed language was a "bad idea" because "nobody
else does this ...."  This is not evidence of a deliberate intent
to deceive on the part of XAP; rather, it is at most evidence that
XAP was attempting to place itself in the mainstream of then
current internet practices.

CollegeNET has conceded that standards and practices relating
to data privacy were "evolving" and unsettled during the relevant
time period.  Mr. Wolfston testified about the changing nature of
privacy laws and admitted that his own company first adopted a
comprehensive privacy statement only a few months before the jury
trial.  (Ex. B, 546:11-549:1.)  CollegeNET's expert, Ms. Fena,
referred to the privacy standards that existed as of 2000 as "the
jumbled state of the Internet privacy game board ...."  (*Id.*,
318:10-19.)  It is disingenuous for CollegeNET to both acknowledge
the uncertainty and confusion surrounding standards regarding data
privacy and claim XAP intended to deceive.

**B. Disgorgement, If Any, Should Be Limited to No More Than $2,553,245**

CollegeNET bears the initial burden to prove XAP's gross sales. 15 U.S.C. §1117(a); *see also Maier Brewing,* 390 F.2d at 124. However, once XAP proves applicable costs and deductions,[13] CollegeNET may not (without acquiescing in XAP's analysis) rest on its proof of gross sales, as it has had equal access to XAP's cost data and other financial information. *American Honda Motor*, 918 F.2d at 1063-64.

XAP has proven its costs in two different ways. Mr. Jacobson testified that from 1997 through 2005, XAP suffered cumulative operating losses of $1.3 million, calculated based on generally accepted accounting principles ("GAAP"). (Ex. C, 149:22-151:18.) It is undisputed that, according to the GAAP method, XAP realized no profits and experienced a substantial cumulative loss from 1997 through 2005. (*Id.*, 183:5-17.)[14] Excluding the costs of litigation, which were approximately $2 million through December 2005 (Ex. D, 40:8-17), XAP's disgorgeable profits using the GAAP method would be approximately $700,000.

Dr. Lynde independently calculated XAP's profits. Using a percentage completion method (the same method Mr. Partin used) (Ex. C, 183:5-17; Ex. D, 40:24-41:13), he concluded that XAP's

---

[13] Allowable deductions typically include the defendant's overhead, most operating expenses (including expenses for marketing, sales, administration, and shipping), and federal income taxes. *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 665 (2d Cir. 1970); *American Honda Motor Co. v. Two Wheel Corp.*, 918 F.2d 1060, 1062 (2d Cir. 1990) (affirming calculation of defendant's profits based on deduction of "proportionate share of [defendant's] annual expenses" from revenue associated with sales at issue).
[14] Mr. Partin acknowledged that XAP accumulated substantial deficits during this period. (Ex. C, 187:12-19.)

XAP's POST-TRIAL BRIEF

maximum disgorgeable profits were $2,553,245, representing 19% of XAP's total revenue through December 2005 (*Compare* Ex. C, 161:8-16 *with* Ex. D, 30:6-21).[15]   However, given CollegeNET's unreasonable delay, profits subject to disgorgement should be limited to $1,225,609 for the period June 10, 2002 through the end of 2004 or, alternatively, $1,371,755 for the period June 10, 2002 through June 30, 2006.  (Ex. D, 42:1-11.)

To determine XAP's costs, Dr. Lynde reviewed XAP's financial information, including the general ledger (PTX 293) and XAP's internal statements of operations used for management purposes, and he also spoke with XAP's controller, Dawn Helin.  (Ex. D, 37:10-38:25, 39:14-40:17.)   Based on this extensive review, Dr. Lynde concluded that all of XAP's indirect expense items were a necessary and reasonable expense of operating XAP's Mentor sites, and he allocated a portion of these indirect expenses on a per revenue basis.  (Ex. D, 39:14-40:7.)   This methodology was uncontested.  (*Id.*, 45:2-17.)   Dr. Lynde also determined that licensing fees were a direct cost and assigned the full value to the Mentor sites.  (*Id.*, 39:14-40:7, 49:10-21.)[16]

Mr. Partin did not provide his own calculation of XAP's profits or offer any rebuttal to Dr. Lynde's analysis; instead he testified only to what he believed were XAP's gross sales.  (Ex. C, 164:19-24.)   Accordingly, Dr. Lynde's unrebutted calculation of XAP's disgorgeable profits represents the maximum disgorgement

---

[15] Dr. Lynde's disgorgeable profits are based on revenue related to Mentor sites with opt-in questions.  (Ex. D, 35:17-37:8.)
[16] Mr. Partin does not dispute Dr. Lynde's cost allocation method, which is an accepted method for calculating XAP's costs.  *American Honda Motor Co.*, 918 F.2d at 1062, 1064.

CollegeNET could obtain in this case.

## VII.  COLLEGENET IS NOT ENTITLED TO ATTORNEYS' FEES

### A.  An Exceptional Case Requires At Least a Proof of Willfulness

An award of attorneys' fees is available only if a case is "exceptional."  15 U.S.C. §1117(a).  Exceptionality must be established by clear and convincing evidence.  *Seven-Up*, 86 F.3d at 1390.  Proof that a case is exceptional requires proof of "malicious, fraudulent, deliberate or willful" conduct.  *Lindy Pen,* 982 F.2d at 1409; *see also Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir. 1982).

Panels in the Ninth Circuit have split on whether something more than willfulness is required to support a finding that a case is exceptional.  *See Earthquake Sound*, 352 F.3d at 1220-1221) (concurrence) (explaining split); *see also Watec Co. v. Liu*, 403 F.3d 645, 656 (9th Cir. 2005) (a jury finding of intentional infringement does not necessarily equate with an exceptional case); *Gracie v. Gracie*, 217 F.3d 1060, 1071 (9th Cir. 2000) ("[e]xceptional circumstances can be found when the non-prevailing party's case 'is groundless, unreasonable, vexatious, or pursued in bad faith'").  Under either view, "willfulness" is a necessary condition.  *Earthquake Sound*, 352 F.3d at 1216-1217.

### B.  This Is Not an Exceptional Case

CollegeNET's false advertising case against XAP was not strong.  The Lanham Act claim was dismissed twice (Dkt. 141, 173 & 180), and the Court found that issues of material fact precluded summary judgment for CollegeNET (Dkt. 504).  The Ninth Circuit has rejected claims for attorneys' fees in close cases or in cases

presenting "difficult issues." *See, e.g., U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1043-44 (9th Cir. 1986).  In these circumstances, and where XAP's advertising was not "willful," the Court should decline to find this case exceptional.

The few Lanham Act cases the Ninth Circuit has deemed exceptional are clearly distinguishable.  For example, in *Earthquake Sound*, the defendant was found to have infringed the plaintiff's trademark as a matter of law, there was substantial evidence of actual confusion, and the defendant falsely promised the plaintiff it would stop using the trademark, but did not.  352 F.3d at 1217-1218.  Similarly, in *Transgo, Inc. v. Ajac Transmission Parts Corp.*, the defendant sold a competing product that was virtually identical to the plaintiff's.  768 F.2d 1001, 1011 (9th Cir. 1985).  The defendant not only infringed the plaintiff's trademark and copyright rights, but also engaged in a "conspiracy to pass off an imitation product."  *Id.* at 1026.  The district court considered this "substantial evidence" of "malicious, wanton, and oppressive conduct."  *Id.* at 1026.  The Ninth Circuit agreed both cases were exceptional.

This dispute involves no such exceptional circumstances, and the Court should decline to award attorneys' fees.

Dated: February 20, 2007    FENWICK & WEST LLP

By: *Virginia K. DeMarchi*
Virginia K. DeMarchi
(CSB No. 168633, *admitted pro hac vice*)
Email: vdemarchi@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA  94041
Attorneys for Defendant
XAP CORPORATION

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 20, 2006, a true copy of the foregoing

### XAP CORPORATION'S POST-TRIAL BRIEF
### (BENCH TRIAL PHASE)

was served by electronic mail to:

Arthur S. Beeman
(arthur.beeman@dlapiper.com)
Elizabeth Day
(elizabeth.day@dlapiper.com)
Carrie Williamson
(carrie.williamson@dlapiper.com)
**DLA PIPER US LLP**
153 Townsend Street, Suite 800
San Francisco, CA  94107


Michael N. Zachary
(michael.zachary@klarquist.com)
Stephen J. Joncus
(stephen.joncus@klarquist.com)
Scott E. Davis
(scott.davis@klarquist.com)
**KLARQUIST SPARKMAN LLP**
121 S.W. Salmon Street, Suite 1600
Portland, OR 97204


*Attorneys for CollegeNET, Inc.*


By: _____
Betti J. Walrod
Email: bwalrod@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Telephone: (650) 988-8500
Facsimile: (650) 938-5200